# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNION HOME MORTGAGE CORP., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No.  4:21-cv-385 |
| | ) |
| ERIK CROMER, | ) |
| | )   Judge: |
| and | ) |
| | ) |
| HOMESIDE FINANCIAL, LLC, | ) |
| | ) |
|     Defendants. | ) |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Union Home Mortgage Corp. ("Union Home"), by counsel, for its Verified Complaint for Injunctive Relief and Damages against Defendants Erik Cromer ("Cromer") and Homeside Financial, LLC ("Homeside"), alleges and states as follows:

## BACKGROUND

1. Union Home brings this action against Cromer, its former employee, and Homeside, a direct competitor of Union Home and Cromer's current employer, for Cromer's breaches of his contractual covenants and common-law duties to Union Home, and Homeside's inducement and facilitation of those breaches in tortious interference with Union Home's rights.

2. Most significantly, Homeside, having been made aware that hiring Cromer in the position it offered him employment would violate his post-employment non-competition provision, did so anyway.

## PARTIES

3.     Union Home is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

4.     Cromer was previously employed by Union Home as a Team Leader/Managing Loan Officer, or branch manager, at its office located in Youngstown, Ohio.

5.     Homeside is a market competitor to Union Home in the home mortgage lending and refinancing industry that now advertises an office located in Youngstown, Ohio on its website.

6.     Cromer is now employed by Homeside in Youngstown, Ohio.

## JURISDICTION AND VENUE

7.     Paragraphs 1-6 are incorporated herein by reference as if fully restated herein.

8.     This is an action seeking injunctive relief and damages against Cromer and against Homeside based on Cromer's violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, as well as statutory violations and violations of the common law related to Cromer's violations of his contractual covenants and common-law duties to Union Home, and Homeside's facilitation and inducement of those violations in tortious interference with Union Home's rights.

9.     Union Home is an Ohio corporation with its principal place of business in Strongsville, Ohio.

10.     Cromer is a resident and citizen of Ohio and resides in Mahoning County, Ohio.

11.     Homeside is a limited liability company headquartered in Columbia, Maryland. Homeside is licensed to do business in Ohio, has office locations in Ohio, and has a registered agent for service of process in Columbus, Ohio.

12.     Jurisdiction is proper in federal court pursuant to 28 U.S.C. § 1331 because one of Union Home's claims is based on a federal question. Specifically, Union Home has brought a cause of action under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

13.     The Court also has supplemental jurisdiction over Union Home's contractual and state law claims pursuant to 28 U.S.C. § 1367.

14.     Cromer's agreement with Union Home (the "Employee Agreement") states that any claim for breach of restrictive covenants and/or the unauthorized use and/or disclosure of information "may only be instituted and prosecuted in the state or federal courts of Ohio and each party hereby waives the right to challenge jurisdiction or seek to change venue."  Employee Agreement, § 9. A true and accurate copy of the Employee Agreement is attached hereto as Exhibit A.

15.     The Court has jurisdiction to hear this case and venue is proper in this Court.

16.     Venue is proper in this Court because Cromer is a resident of Mahoning County and the relevant events described herein occurred in Mahoning County.

17.     The choice of law provision in the Employee Agreement identifies Ohio law as governing the contractual claims at issue in this matter.  (Ex. A, ¶7).

## FACTUAL BACKGROUND

### Cromer's Employment with and Contractual Obligations to Union Home

18.     Paragraphs 1-17 are incorporated herein by reference as if fully restated herein.

19.     On March 22, 2019, Cromer and Union Home entered into the Employee Agreement, pursuant to which Cromer would serve as a Team Leader/Managing Loan Officer -- also known as a branch manager -- for Union Home at its Youngstown, Ohio office.  (Ex. A).

Cromer's duties included generating and originating loans and he was a producing loan officer for Union Home.

20.    As a Team Leader/Managing Loan Office, or branch manager, Cromer acquired confidential, proprietary, and trade secret information regarding, among other things, Union Home's customers, prospective customers, and referral sources, as well as Union Home's sales and marketing strategies, lending practices, and risk tolerances.

21.    Union Home takes reasonable measures to keep this information secret and out of the hands of its competitors. Union Home does so, for example, by requiring employees (such as Cromer) to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

22.    As a Team Leader/Managing Loan Officer, or branch manager, Cromer was given access to and was in a position of trust with regard to the goodwill between Union Home and its customers, prospective customers, and referral sources.

23.    Union Home invests significant time, effort, and resources into recruiting, training, and retaining its Team Leader/Managing Loan Officers and branch managers.

24.    In the Employee Agreement, Cromer agreed as follows:

Employee agrees that he/she will not become employed in the same or similar capacity as he/she was employed with the Company by a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and **October 1, 2022**; the "Restricted Area" shall mean a one hundred (100) mile radius from either the Company's headquarters or any branch office of the Company to which Employee was assigned during the Restricted Period; and a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business.

(Ex. A, ¶3).

4

25.     Cromer agreed that he "shall not employ or seek to employ any person who is employed by [Union Home] or otherwise directly or indirectly induce such person or entity to leave his/her employment." (*Id*.).

26.     Cromer agreed not to directly or indirectly use, disclose, divulge, reveal, report, publish, or transfer any of Union Home's Confidential Information. (*Id.* at ¶4).

27.     Confidential Information is defined, in part, as "confidential or proprietary information or trade secrets of [Union Home], including but not limited to, written or electronic information: (i) disclosed to [Cromer] or known by [Cromer] as a result of [his] . . . employment, (ii) which is not generally known, and (iii) which relates to or concerns [Union Home]'s business, . . . customers, [and] customer files," among other things. (*Id.*).

28.     Cromer also agreed that any violation of these covenants would cause Union Home irreparable harm and, as a result, specifically "consent[ed] to the issuance of a restraining order and/or an injunction by a court of competent jurisdiction."  (*Id.* at ¶ 6).

29.     Cromer also agreed to "devote [his] best efforts to such full time employment as long as it shall continue."  (*Id.* at ¶1).

30.     Further, Cromer agreed that he "shall be liable for any attorney fees expended by [Union Home] to enforce [the Employee Agreement]." (*Id*. at ¶6).

31.     Cromer was a trusted employee of Union Home, who was given access to the goodwill Union Home has with its customers, prospective customers, and referral sources, as well as Union Home's confidential and trade secret information, including confidential information about Union Home's customers, prospective customers, and referral sources.

32.     The Employee Agreement is a binding and enforceable contract between Union Home and Cromer.

33.     Union Home performed its material obligations under the Employee Agreement.

34.     Cromer owed and continues to owe legal and contractual obligations to Union Home pursuant to the Employee Agreement.

**Cromer Orchestrates a Plan for Himself and Two Subordinates to Leave Union Home for Homeside, and Cromer Improperly Competes with Union Home on Behalf of Homeside**

35.     Union Home previously employed James Boots ("Boots") and Jerry Latronica ("Latronica") as loan officers at its Youngstown, Ohio branch office. Boots and Latronica were responsible for originating and closing mortgage loans for Union Home. Cromer managed the office in which Boots and Latronica worked.

36.     Latronica and Boots resigned from Union Home on October 30, 2020 and November 18, 2020 respectively.  Even before Latronica and Boots resigned from Union Home, there is evidence that suggests business was being diverted to Homeside.

37.     After their resignation from Union Home, Latronica and Boots then began working as loan officers for Homeside, in the same capacity in which they had worked for Union Home and with the same or similar duties.

38.     Given how quickly Latronica and Boots began working for Homeside, it is clear they resigned from Union Home with the explicit intention of going to work for Homeside.

39.     Shortly before Latronica resigned from Union Home, Cromer scheduled a meeting with Boots and Latronica using Union Home's video conferencing service.

40.     Several times since resigning, Cromer received payments to his PNC bank account from Latronica. These payments were unrelated to any work performed for Union Home by either Latronica or Cromer.

41.     After Latronica had resigned from Union Home to go work for Homeside, Cromer's job performance for Union Home markedly deteriorated, and he repeatedly failed to appear for work.

42.     Cromer's actions make clear that he remained at Union Home after Latronica and Boots had left for Homeside in an attempt to force his exit from Union Home.

43.     As a result of Cromer's poor performance for Union Home, on November 12, 2020, Union Home provided Cromer with a separation agreement which would have provided for the end of Cromer's employment with Union Home.

44.     No later than November 13, 2020, and while still employed by Union Home, Cromer acknowledged that he was considering accepting employment with Homeside.

45.     Thus, Homeside had offered employment to Cromer while he was still employed by Union Home.

46.     Cromer attempted to negotiate a release from his non-competition provision that would allow him to join Homeside.

47.     Cromer never executed a separation agreement. Instead, Cromer submitted his resignation to Union Home on or about November 25, 2020.

48.     Following his resignation, Cromer's NMLS license was not transferred and he delayed in announcing his hiring as branch manager at Homeside in Youngstown, Ohio. Once again, Boots and Latronica work as loan officers reporting to Cromer in the same or similar capacity as Cromer worked at Union Home.

49.     In January, 2021, Homeside's website listed Erik Cromer as a Branch manager, along with his NMLS ID.  See screen shot of Homeside website, attached hereto as Exhibit B

50.     Cromer is now being paid by Homeside.

51.     Cromer's employment with Homeside is in the same or similar capacity as his prior work for Union Home.

52.     In addition to serving as a branch manager, Cromer is originating and generating loans, and serving as a producing loan officer for Homeside.

53.     In fact, Cromer received e-mails at his Union Home e-mail address with customer information for a loan that was in process at Homeside.

54.     Homeside is a direct competitor of Union Home that competes with Union Home in and around Youngstown, Ohio, among other places.

55.     Cromer is now competing with Union Home in the same or similar capacity in the same market in which he worked for Union Home and clearly within one hundred miles of the Union Home office in Youngstown, Ohio at which he worked.

56.     The actions of Boots, Latronica, and Cromer as described herein demonstrate an intentional plan for all three to leave Union Home for Homeside.

**Cromer Diverts Business from Union Home By Misappropriating and Using Union Home's Trade Secrets and Confidential Information on Behalf of Competitor Homeside**

57.     On or about October 23, 2020 and November 3, 2020, Cromer sent e-mails from his Union Home account to his personal account containing confidential and proprietary Union Home information, including confidential proprietary Union Home business and information, and confidential and proprietary Union Home customer information.

58.     The Union Home customer information Cromer sent himself was more than a simple "cold-call" list with general contact information for customers; it contained a collection of information such as the customers' and prospective customers' contact information, loan amounts, loan information, and other personal information for the Union Home customers and prospective customers. This information is not known outside the business or publicly available and was

instead confidentially gathered, assembled, and maintained on Union Home's secure network by Cromer while working for Union Home.

59.     There was no legitimate Union Home business purpose for Cromer to send this information to his personal e-mail account.

60.     This is precisely the type of confidential and proprietary information Cromer would need to facilitate the transfer of Union Home customers and prospective customers to Homeside, and this is confidential and proprietary business information which Union Home expends resources to protect.

61.     Thereafter, and as described above, Cromer began to receive payments from Latronica, a former Union Home employee who had left Union Home to work for Homeside. Following that, Cromer ceased coming in to work, resigned from Union Home and began to work for Homeside.

62.     After leaving Union Home for Homeside, Cromer received emails to his Union Home e-mail account, regarding loans that were closing on behalf of Homeside. In addition to demonstrating that Cromer is orchestrating the origination of loans on behalf of Homeside, this also demonstrates that he is using Union Home's confidential customer information, which he improperly sent to himself before leaving Union Home, on behalf of Homeside.

63.     Cromer's employment agreement specifically provides that customer information is Union Home's confidential information and is not to be used for any purpose other than for Union Home's business purposes. Ex. A, § 4.

64.     It is clear Cromer previously worked with these customers while he was employed by Union Home, as they attempted to contact Cromer at his Union Home email address. Thus, any

information concerning customers that Cromer obtained while employed by Union Home is Union Home's confidential and trade secret information.

65.     Cromer used that Union Home confidential and trade secret information to close loans on behalf of Homeside, Union Home's competitor.

66.     Closing a loan on behalf of Homeside is not a Union Home business purpose.

### Homeside Hires Cromer to Be a Branch Manager in Violation of the Employee Agreement and After Being Notified of the Circumstances

67.     Homeside made an offer of employment to Cromer at some time before November 13, 2020, while Cromer was employed by Union Home.

68.     Homeside either knew or should have known that Cromer was subject to restrictive covenants, including non-competition covenants.

69.     On or about November 23, 2020, counsel for Union Home wrote to Homeside advising it that Union Home's branch managers were subject to non-compete agreements with Union Home. A true and accurate copy of this letter is attached as Exhibit C.

70.     Union Home also informed Homeside that any offer of employment to a branch manager, such as Cromer, if accepted, would violate Union Home's branch manager employee agreements. Exhibit C.

71.     Union Home also specifically warned Homeside that, if Homeside induced a branch manager to violate a Union Home employee agreement by hiring the branch manager to a position that violated the employee agreement, Homeside could be liable for tortious interference with the Union Home employee agreement. Exhibit C.

72.     In addition, Union Home notified Homeside that one of the new loan officers Homeside had hired from Union Home, either Boots or Latronica, may have diverted business to Homeside using Union Home's resources and confidential information. Exhibit C.

10

73.     On November 30, 2020, Homeside responded to Union Home's November 23, 2020 letter, and confirmed receipt of that letter and confirmed their awareness that Union Home uses employee agreements for its branch managers and stated that "Homeside has no interest in engaging in activity that would violate a legal restriction on competition." A true and accurate copy of Homeside's letter to Union Home is attached as Exhibit D.

74.     Despite making such a representation, Homeside did exactly that by hiring Cromer as a branch manager in the same or similar capacity as he worked for Union Home.

75.     Homeside also allowed Cromer to close a loan for Homeside using Union Home's confidential customer information, despite Union Home having warned Homeside that its employees were using Union Home's confidential information to close loans on behalf of Homeside.

### COUNT I:  VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 *et seq.* (CROMER)

76.     Paragraphs 1-75 are incorporated herein by reference as if fully restated herein.

77.     Union Home owns trade secrets and confidential business information that derive independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

78.     Union Home takes and has taken reasonable measures to keep such information secret by, among other things, requiring employees to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

79.     Union Home's trade secrets are related to, among other things, Union Home's customers, prospective customers, and referral sources.

80.     Under Ohio law, "[c]ustomer lists have been held to constitute trade secrets," provided that the list "contain[s] information not generally known to or readily ascertainable by the public." *Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016). This Court has looked to the standards imposed by Ohio law as to whether information is a trade secret under the Defend Trade Secrets Act.

81.     Union Home operates in a number of states.  Likewise, the customers and prospective customers with whom Cromer interacted and concerning whom he improperly sent himself information are located in several states and therefore the improper use or disclosure of this information would cause injury to Union Home in Ohio and in other states.

82.     In fact, while employed by Union Home, Cromer was a licensed mortgage originator in the Commonwealth of Pennsylvania, and interacted with Union Home customers and prospective customers in Pennsylvania, and thus clearly had access to Union Home's confidential, proprietary and trade secret information concerning customers outside of Ohio.

83.     Homeside competes with Union Home in Pennsylvania and in fact advertises three locations in Pennsylvania on its website.

84.     Cromer has acquired, disclosed, and/or used Union Home's trade secrets, including customer information, via improper means and without Union Home's permission and has done so willfully.

85.     Union Home has no adequate remedy at law to stop the damage Cromer has caused and will continue to cause by his unlawful conduct.

86.     Unless Cromer is enjoined, this misconduct will continue, and Union Home will continue to suffer losses, including the retention, disclosure, and impermissible use of its confidential information and trade secrets, and loss of customers, future revenue, and goodwill.

### COUNT II:  VIOLATION OF OHIO UNIFORM TRADE SECRETS ACT, OHIO REV. CODE § 1333.61 *et seq.* (CROMER)

87.    Paragraphs 1-86 are incorporated herein by reference as if fully restated herein.

88.    Union Home owns trade secrets and confidential information that derive independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

89.    Union Home takes and has taken reasonable measures to keep such information secret by, among other things, requiring employees to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

90.    Union Home's trade secrets are related to, among other things, customers, prospective customers, and referral sources.

91.    Under Ohio law, "[c]ustomer lists have been held to constitute trade secrets," provided that the list "contain[s] information not generally known to or readily ascertainable by the public." *Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016).

92.    Cromer acquired Union Home's trade secrets and confidential information, including customer information, through his employment at Union Home.

93.    Cromer has disclosed and/or used Union Home's trade secrets and confidential information, including customer information, without authorization.

94.    Union Home has no adequate remedy at law to stop the damage Cromer has caused and will continue to cause by his unlawful conduct.

95.    Unless Cromer is enjoined, this misconduct will continue, and Union Home will continue to suffer losses, including the retention, disclosure, and impermissible use of its confidential information and trade secrets, and loss of customers, future revenue, and goodwill.

13

## COUNT III:  BREACH OF COVENANT NOT TO COMPETE
## (CROMER)

96.     Paragraphs 1-95 are incorporated herein by reference as if fully restated herein.

97.     The Employee Agreement is a binding and enforceable contract, under which Union Home has fully performed.

98.     Under the Employee Agreement, Cromer is restricted from competing with Union Home within 100 miles of his Union Home branch location in Youngstown, Ohio until October of next year (2022).

99.     Cromer's employment with Homeside, in competition with Union Home, in the same or similar capacity (both as a branch manager and as a producing loan officer) and in the same market (the Youngstown, Ohio area) is a breach of the covenant not to compete in the Employee Agreement with Union Home.

100.    Cromer's breach of the covenant not to compete in the Employee Agreement has caused and will, unless restrained, continue to cause immediate and irreparable injury, loss, and damage to Union Home in an amount that cannot be precisely calculated, as agreed to by Cromer in the Employee Agreement.

## COUNT IV:  BREACH OF NON-SOLICITATION COVENANT (CROMER)

101.    Paragraphs 1-100 are incorporated herein by reference as if fully restated herein.

102.    Latronica and Boots both resigned their employment with Union Home to join Homeside and both now work for the Homeside branch that Cromer manages.

103.    Cromer's actions in regard to his coworkers and/or subordinates at Union Home breached his contractual obligations, as stated in the Employee Agreement, to refrain from seeking to employ, directly or indirectly, Union Home's employees.

104.    The breaches by Cromer of his obligation to refrain from soliciting Union Home's

14

employees and to refrain from employing Union Home's employees, pursuant to the Employee Agreement, have caused and will continue to cause injury, loss, and damage to Union Home.

### COUNT V:  BREACH OF CONTRACTUAL DUTY OF LOYALTY (CROMER)

105.    Paragraphs 1-104 are incorporated herein by reference as if fully restated herein.

106.    While employed by Union Home, Cromer owed a contractual duty of loyalty to Union Home as specified in the Employee Agreement.

107.    Cromer's employment with Union Home ended upon his resignation on or about November 25, 2020.

108.    While employed by Union Home, Cromer facilitated the transfer of one or more Union Home employees to competitor Homeside, in violation of his contractual duty of loyalty.

109.    In addition, Cromer was required to put forth his best efforts to his employment with Union Home while he was employed by Union Home. Cromer failed to do so in several ways, including failing to appear for work at Union Home, transferring Union Home's confidential information  to himself to later be used against Union Home, and in accepting payments from Latronica, a former Union Home employee who was going to work for Homeside.

110.    Cromer's actions breached his contractual duty of loyalty to Union Home.

111.    Cromer's breaches of his contractual duty of loyalty pursuant to the Employee Agreement have caused injury, loss, and damage to Union Home and continuation of these breaches will result in immediate and irreparable injury, loss, and damage to Union Home.

### COUNT VI:  BREACH OF COMMON LAW DUTY OF LOYALTY (CROMER)

112.    Paragraphs 1-111 are incorporated herein by reference as if fully restated herein.

113.    While employed by Union Home, Cromer owed a common law duty of loyalty to Union Home.

114.    Cromer's employment with Union Home ended upon his resignation on or about November 25, 2020.

115.    Prior to the end of his employment with Union Home, Cromer facilitated the transfer of Union Home's employees to competitor Homeside, in violation of his common law duty of loyalty.

116.    In addition, Cromer was required to put forth his best efforts to his employment with Union Home while he was employed by Union Home. Cromer failed to do so in several ways, including failing to appear for work at Union Home, transferring Union Home's confidential information to himself to later be used against Union Home, and in accepting payments from Latronica, a former Union Home employee who was going to work for Homeside.

117.    Cromer's actions breached his common law duty of loyalty to Union Home.

118.    Cromer's breaches of his common law duty of loyalty have caused injury, loss, and damage to Union Home.

## COUNT VII: BREACH OF CONFIDENTIALITY COVENANTS (CROMER)

119.    Paragraphs 1-118 are incorporated herein by reference as if fully stated herein.

120.    Cromer sent himself Union Home's confidential information before leaving from his employment with Union Home and while he was negotiating his future employment with Homeside for the purpose of disclosing it to Homeside and/or using it to compete with Union Home.

121.    Cromer's actions breached his contractual confidentiality obligations to Union Home, as reflected in the Employee Agreement, in multiple ways.

122.    In addition, and as described herein, Comer used Union Home's confidential customer information to close at least one loan on behalf of Homeside.

123.    The breaches by Cromer of his confidentiality obligations pursuant to the Employment Agreement have caused and will continue to cause injury, loss and damage to Union Home and continuation of these breaches will result, unless restrained, in immediate and irreparable injury, loss, and damage to Union Home.

## COUNT VIII- TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (HOMESIDE)

124.    Paragraphs 1-123 are incorporated herein by reference as if fully stated herein.

125.    Union Home has an expectancy of continued business relationships with its employees as well as the customers and borrowers with whom those employees deal and for whom they originate and process mortgage loans, particularly because Union Home's customer information is confidential, proprietary, and a trade secret.

126.    Homeside was well aware of, and as of November 23, 2020 had actual knowledge of, Union Home's business relationships with its employees and customers, and knew that Union Home considered its customer information to be confidential.

127.    Nevertheless, Homeside, acting through Cromer, Boots, and Latronica, has intentionally and improperly interfered with Union Home's expectancy of continued business relationships by inducing Union Home's employees to leave Union Home for Homeside, and in allowing Union Home employees to improperly divert customers and business from Union Home to Homeside even after Homeside had actual knowledge that Union Home considered its customer information to be confidential to Union Home.

128.    Homeside's interference was not only knowing and intentional, but undertaken with actual malice toward Union Home. Homeside's motive was specifically to inflict financial harm on Union Home, its competitor, in and around Youngstown, Ohio, a new market for Homeside, by poaching the branch manager, loan officers, and customers of Union Home's

17

Youngstown, Ohio office. Homeside continued to interfere in Union Home's business relationships after Union Home specifically warned Homeside to stop its interference.

129.    Homeside is not permitted to engage in its malicious and improper conduct, which goes far beyond ordinary competition between competing businesses. Homeside's misconduct is so egregious, and undertaken with such intentional ill will toward Union Home and with such conscious disregard of Union Home's rights, that Union Home is entitled to punitive damages.

130.    As a result of Homeside's tortious interference with Union Home's business relationships, including relationships with employees and customers, Union Home is sustaining damages in an amount to be determined at trial.

## COUNT IX- TORTIOUS INTERFERENCE WITH CONTRACT (HOMESIDE)

131.    Paragraphs 1-130 are incorporated herein by reference as if fully stated herein.

132.    Union Home's Employee Agreement with Cromer is a valid and binding contract.

133.    At all relevant times, Union Home performed its obligations under the Employee Agreement.

134.    Homeside had actual knowledge of the terms of Union Home's branch manager employee agreement. To the extent that Homeside was not aware of the Employee Agreement either from Cromer or from its industry knowledge of Union Home's use of such agreements for branch managers, Union Home specifically informed Homeside of the existence of Union Home's branch manager employee agreements and the relevant terms of such agreements. Union Home informed Homeside of the non-competition provision in its branch manager employee agreements, and that Homeside's proposed employment of any branch manager would violate the Union Home branch manager employee agreements, no later than November 23, 2020.

135.    Through his conduct set forth above, namely by accepting employment with

Homeside in Youngstown, Ohio before the expiration of the non-competition covenant of the Employee Agreement, Cromer has materially breached the non-competition covenant in section § 3 of the Employee Agreement.

136.    As detailed herein, Cromer has also violated other covenants and/or obligations within the Employee Agreement, including his duties of confidentiality, loyalty, and non-solicitation of Union Home employees, all while still employed by Union Home.

137.    Cromer's actions were induced and facilitated by Homeside which: hired Cromer to be a branch manager in Youngstown, Ohio after being notified that such employment would violate Union Home's branch manager employee agreements; hired Latronica and Boots after Cromer wrongfully solicited them; began paying Cromer, through Mr. Latronica, while he was still employed by Union Home; and by allowing Cromer to use Union Home's confidential customer information to close loans on behalf of Homeside, after being specifically notified that Union Home considered its customer information to be confidential.

138.    Homeside's interference with the Employee Agreement was intentional and deliberate, without justification, and with malice or conscious disregard of Union Home's contract rights in the Employee Agreement.

139.    As a result of Homeside's tortious interference with the Employee Agreement, Union Home has been and will continue to be harmed, entitling it to injunctive relief, as well as actual damages and all other relief deemed just and proper.

**<u>PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>**

140.    Paragraphs 1-139 are incorporated herein by reference as if fully restated herein.

141.    As a direct and proximate result of Cromer's conduct, Union Home has suffered, and will continue to suffer, irreparable harm in the loss of business opportunities as well as harm

to its goodwill and confidential information in an amount that cannot be fully, completely, and adequately remedied at law.

142.    In the Employee Agreement, Cromer expressly acknowledged and agreed that a remedy at law for any breach or threatened breach of the provisions of the Employee Agreement would be inadequate, thereby warranting issuance of injunctive relief.

143.    Cromer has and continues to willfully violate the Employee Agreement including by accepting employment in the same area and in the same or similar capacity with Homeside, inducing his Union Home team members to resign from Union Home and go to work for Homeside, and by taking Union Home's confidential information before ending his employment with Union Home.

144.    Without injunctive relief against Cromer and all those in active concert or participation with him, he will continue to violate his restrictive covenants, thereby causing Union Home immediate and irreparable harm. In contrast, no harm will accrue to Cromer by entry of injunctive relief as Cromer never had the right to violate his obligations to Union Home.

145.    Injunctive relief is appropriate because protection and maintenance of Union Home's proprietary information and protection of its goodwill is a vital and legitimate business concern. In the absence of injunctive relief, it is highly unlikely that Union Home will have the ability to precisely calculate the extent of the harm caused by Cromer's actions.

146.    The public interest will not be harmed if an injunction is granted.

147.    Given Cromer's willful and deliberate violations of his obligations any bond required to be posted by Union Home should be *de minimis.*

WHEREFORE, Union Home respectfully requests that the Court grant the following relief:

A.     Issue a preliminary and then permanent injunction against Cromer and all those in active concert or participation with him requiring specific performance of the terms and conditions of the Employee Agreement and prohibiting Cromer from competing with Union Home or soliciting its employees in violation of the Employee Agreement;

B.      Enter judgment in favor of Union Home and against Cromer and Homeside on all counts in an amount to be determined at trial and to pay damages to Union Home, including, but not limited to, compensatory and punitive damages, costs, interest, and reasonable attorneys' fees;

C.     Grant all other relief the Court deems just and proper in the circumstances.

## **<u>VERIFICATION</u>**

I, Jim Ferriter, the National Retail Sales Manager for Union Home Mortgage Corp., verify under penalties of perjury that the foregoing facts and allegations are true and accurate to the best of my knowledge and belief.

Dated: February <u>18</u>, 2021

*Jim Ferriter*
_____
Jim Ferriter

Respectfully submitted,

*/s/ Jason T. Clagg*
Jason T. Clagg (0097303)
(jason.clagg@btlaw.com)
**BARNES & THORNBURG LLP**
888 S. Harrison Street, Suite 600
Fort Wayne, IN 46802
Phone:  (260) 423-9440
Fax:  (260) 424-8316

and

Paul N. Garinger (0079897)
(paul.garinger@btlaw.com)
**BARNES & THORNBURG LLP**
41 South High Street, Suite 3300
Columbus, OH  43215
Phone: (614) 628-0096
Fax:  (614) 628-1433

ATTORNEYS FOR PLAINTIFF