PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNION HOME MORTGAGE CORP., | ) | |
| | ) | CASE NO. 4:21CV0385 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| ERIK CROMER, *et al.*, | ) | |
| | ) | **PRELIMINARY INJUNCTION** |
| Defendants. | ) | [Resolving ECF No. 3] |

Pending is Plaintiff Union Home Mortgage Corp.'s ("Union Home") Motion for Preliminary Injunction (ECF No. 3).

## I. Introduction

Union Home filed this lawsuit alleging that its former employee, Defendant Erik Cromer, breached restrictive covenants in his employment agreement (ECF No. 1-1) – specifically, non-competition, non-solicitation, and confidentiality – after he resigned and began working for Defendant Homeside Financial, LLC ("Homeside"). Plaintiff now seeks to enjoin Cromer,[1] and anyone acting in active concert or participation with him, from: (1) competing with Union Home in and around Youngstown, Ohio; (2) soliciting Union Home employees; and (3) using or disclosing Union Home's confidential and trade secret information.

---

[1] Union Home's claims against Homeside are not the subject of this Motion.

(4:21CV0385)

The Court held an electronic hearing *via* Zoomgov.com on April 21, 2021. James Ferriter and Cromer testified as witnesses. The Court has considered the pre-hearing briefing, the testimony of witnesses, exhibits submitted prior to the hearing,[2] and arguments of counsel, as well as the entire record in this matter. Duly informed, the Court, herein, enters a Preliminary Injunction.[3]

## II. Stipulated Facts

Stipulated facts[4] follow:

1. Union Home is an Ohio corporation in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

2. Homeside is a Maryland limited liability company that is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

3. Homeside and Union Home both provide homeowners and prospective home buyers with mortgage and refinance loan products in and around Youngstown, Ohio.

4. Cromer was employed by Union Home beginning in 2005, first as a loan officer in Union Home's Youngstown, Ohio branch office.

5. Later, Cromer became a team leader/managing loan officer in Union Home's Youngstown branch office.

---

[2] *See* Order (ECF No. 8) at PageID #: 82.

[3] At the conclusion of the hearing, the Court announced that it would grant the motion and issue a Preliminary Injunction at the close of business on April 23, 2021, affording the parties ample time to discuss what occurred at the hearing before the Court entered a ruling on the docket.

[4] *See* Joint Proposed Stipulation of Facts (ECF No. 21).

(4:21CV0385)

6. Exhibit A to the Complaint (ECF No. 1-1) is a true and accurate copy of the Union Home Employment Agreement ("Agreement") executed by Cromer on March 22, 2019.

7. Union Home also employed two loan officers in Youngstown, Ohio, James Boots ("Boots") in or around January 2019, and Jerry Latronica ("Latronica"), in or around May 2016. Boots and Latronica worked in the same Union Home branch as Cromer.

8. Cromer first contacted Homeside via email on October 13, 2020.  A true and accurate copy of Cromer's October 13, 2020 email is attached as Exhibit 1(a) (ECF No. 20-1 at PageID #: 275-80) to Plaintiff's Reply Memorandum.

9. On October 21, 2020, while still employed at Union Home, Cromer sent an email from his Union Home email account to his personal email account with the subject line, "Preapproval List," and attached a document titled, "PA GP Pipeline 2020" spreadsheet that contained information regarding forty-six customers.  A true and accurate copy of Cromer's October 21, 2020 email is attached as Exhibit 2(l) (ECF No. 20-1 at PageID #: 484-91) to Plaintiff's Reply Memorandum.

10. On October 27, 2020, Cromer sent an email to Homeside's VP of Business Development, Heather Mitchell.  A true and accurate copy of Cromer's October 27, 2020 email is attached as Exhibit 1(j) (ECF No. 20-1 at PageID #: 325-26) to Union Home's Reply Memorandum.

11. On or about October 30, 2020 and November 18, 2020, respectively, Latronica and Boots resigned from Union Home.

12. Latronica and Boots became employed by Homeside after leaving Union Home. Neither Latronica nor Boots are subject to a non-compete covenant with Union Home.

4

(4:21CV0385)

13. On or about November 2, 2020, Cromer met with one or more representatives of Union Home.

14. On or about November 23, 2020, Cromer sent a letter to Union Home confirming he was no longer employed by Union Home. *See* Cromer Termination Letter (ECF No. 15-4).

15. Cromer signed an Employment Agreement with Homeside on or about January 5, 2021. A true and accurate copy of the Homeside Employment Agreement is attached as Exhibit 5 (ECF No. 15-5) to Defendants' Memorandum in Opposition.

16. Cromer is employed by Homeside in Youngstown, Ohio.

17. Cromer's mortgage loan originator license has not been transferred to Homeside.

### III. Background

The Employee Agreement (ECF No. 1-1) contains a post-employment covenant not to compete, which prohibits Cromer from working in a similar capacity for a competitor in a defined area until October 1, 2022. Specifically, the Employee Agreement provides:

> 3. <u>Restrictive Covenants</u>. Employee agrees that he/she will not become employed in the same or similar capacity as he/she was employed with the Company by a Competitive Entity in the Restricted Area during the Restricted Period. For purposes of this Agreement, the "Restricted Period" shall be the period between the date this Agreement is executed and *October 1, 2022*; the "Restricted Area" shall mean a one hundred (100) mile radius from either the Company's headquarters or any branch office of the Company to which Employee was assigned during the Restricted Period; and a "Competitive Entity" shall be any entity that competes with the Company in the home mortgage banking or brokering business. The location of Employee's business office after their employment with the Company does not resolve whether Employee has engaged in competitive activity in violation of this covenant. Additionally, throughout both the Restricted Period as well as the one year thereafter, Emp1oyee shall not employ or seek to employ any person who is employed by the Company or otherwise directly or indirectly induce such person or entity to leave his/her employment. . . .

(4:21CV0385)

> 4. <u>Confidential Information</u>.  Employee shall not (i) use any Confidential Information for any purpose other than on behalf of the Company, or (ii) directly or indirectly disclose, divulge, reveal, report, publish or transfer, for any purpose whatsoever, any Confidential Information to any third party.  When in tangible form, any and all Confidential Information shall be promptly returned to the Company at the request of the Company or upon separation of employment, whichever occurs first.  For purposes of this Agreement, "Confidential Information" shall include confidential or proprietary information or trade secrets of the Company, including, but not limited to, written or electronic information: (i) disclosed to Employee or known by Employee as a result of his or her employment, (ii) which is not generally known, and (iii) which relates to or concerns the Company's business, technology, information systems, computer programs, software, customers, customer files, suppliers, vendors, sales, marketing or finances. Confidential Information shall also include all information and matters specifically designated as proprietary and/or confidential by the Company's customers or other business partners.

ECF No. 1-1 at PageID #: 24.

During his deposition, James Farriter, a Senior Vice President at Union Home, was asked if there "is some level of the company that is kind of the cutoff for employment agreements." He responded:

> A.  Yeah, there's not.  I mean, it's all -- you know, there's no, like, rule book as to who has an agreement across the company.  But on the retail side, as I said,

(4:21CV0385)

loan officers, when they start with us, they all sign a one-year agreement. And that's tied to the investment that we're making in each other for that first year. . . . Deposition of James Farriter (ECF No. 28) at PageID #: 1532.

Cromer first contacted Homeside *via* email on October 13, 2020 confessing his desire "to move [him] and [his]team within an aggressively short amount of time."[5] ECF No. 20-1 at PageID #: 279. Cromer then followed up with a call to Homeside's VP of Business Development, Heather Mitchell, on October 14, 2020, and exchanged follow-up emails again referring to Cromer's team and letting Homeside know about Cromer's employment agreement with Union Home. ECF No. 20-1 at PageID #: 282-85; 287-300.

On October 15, 2020, Cromer emailed his Union Home Employee Agreement (ECF No. 1-1) to Chris Miller, Homeside's "Co-Founder, Managing Partner." ECF No. 20-1 at PageID #: 302-305. The following day, Cromer coordinated a conference call between his team and Mitchell. *See* ECF No. 20-1 at PageID #: 307-308. Thereafter, Cromer copied his team members, Boots and Latronica, on his email to Mitchell "so you have their emails as well." ECF No. 20-1 at PageID #: 310. Again on October 18, 2020, Cromer wrote "for all intents and purposes, let say me *and my team* make the decision to come aboard. . . ." ECF No. 20-1 at PageID #: 315 (emphasis added).

During his deposition, Cromer testified:

> Q. And you were working to build the Union Home name in the Youngstown area while you were employed by Union Home?
> A. Yes.

---

[5] That same email begins with Cromer introducing himself by stating: "I am exploring a move from my current company . . . Are you exploring any opportunity to potentially grow and expand your presence in Ohio?" *Id.*

(4:21CV0385)

>    Q. In that last paragraph on that second page of Exhibit 3, you say, We've got aggressive rates and closing costs. And the "we," you're including you and your Union Home team?
>    A. Myself and Union Home.

Deposition of Erik Cromer (ECF No. 25-1) at PageID #: 956.

>    Q. So when you referred to your team, who were you referring to, then? We'll go through several emails. Who were you referring to as your team while you were working at Union Home?
>    A. My LOAs, loan officer assistant[s].
>    Q. That would be Robert Lane and Debra Hunt?
>    A. Yes, sir.

ECF No. 25-1 at PageID #: 952-53.

On October 23, 2020, Cromer sent Courtney Maes at Homeside seven emails attaching confidential W2s, bank statements, driver's license, home insurance quote, tax and property information and purchase agreement *of a customer* that had been sent to him while he was employed at Union Home. See ECF No. 20-1 at PageID #: 360-424. Cromer testified:

>    Q. I'm trying to understand why you, as a Union Home loan officer, forwarded a potential customer to a competitor?
>            MS. BIGLER:· Objection.
>        Form. You can answer.
>    A. I already answered the question. Because the rates and costs -- the rates were high, the costs were exorbitant, and I thought, in good conscience, that I could not originate that mortgage.

ECF No. 25-1 at PageID #: 1049.

>    Q. So as an employee of Union Home and a loan officer at Union Home, you were telling potential customers that you, in good conscience, couldn't originate a loan for them at Union Home, correct?
>    A. Yes.

ECF No. 25-1 at PageID #: 1073-74.

8

(4:21CV0385)

On or about November 2, 2020, Cromer met with members of Union Home's senior leadership, including Al Blank, Bill Cosgrove, James Ferriter, and Brian Smith, to discuss his dissatisfaction with Union Home. ECF No. 15-1 at PageID #: 176, ¶ 7. Union Home effectively terminated Cromer's employment at the end of the meeting, as Cromer's access to Union Home's email and telephone system was shut off, and Blank escorted him out of the building. ECF No. 15-1 at PageID #: 176, ¶ 7.

On November 3, 2020, Cromer forwarded to his personal email account a "lead" for a Union Home prospective customer. ECF No. 20-1 at PageID #: 493. That same day, a prospective Union Home customer, who was listed on Cromer's Pipeline, sent an email to Cromer's Union Home email attaching her confidential bank statements, paystubs and w2s, which Cromer promptly forwarded to his personal email. ECF No. 20-1 at PageID #: 495-520. Cromer and his Homeside team then followed up with this same customer to originate a mortgage loan after he joined Homeside. ECF No. 20-1 at PageID #: 522-27.

Thereafter, Cromer attempted to negotiate, through his prior counsel, a release from the restrictions contained in the Employee Agreement (ECF No. 1-1), but was unsuccessful. ECF No. 15-1 at PageID #: 176, ¶ 8; ECF No. 1 at PageID #: 7, ¶ 46. Cromer ultimately confirmed his understanding that Union Home had terminated his employment *via* letter on November 23, 2020. ECF No. 15-1 at PageID #: 176, ¶ 9; ECF No. 15-4.

On January 11, 2021, Homeside hired Cromer as a non-producing branch manager, as opposed to a team leader/managing loan officer, to work in Youngstown, Ohio. ECF No. 15-1 at PageID #: 176, ¶ 10; Cromer Agreement (ECF No. 15-5). The Branch Manager, VP Employment Agreement (Non-Producing) provides, in relevant part:

9

(4:21CV0385)

>    1.3    General Duties.
>    (a)    Employee's primary duty shall be managerial.    Employee shall at all times devote one hundred percent ( 100%) of Employee's working hours to supervising and managing the day-to-day affairs of the Branch, including all Branch Employees.   In this regard, Employee's managerial functions (collectively "Managerial Duties") shall include without limitation:
>
>    \*     \*     \*
>
>    (v)    Developing and maintaining a network of relationships with existing and prospective clients, promoting the image and reputation of Company as creative, dynamic and competitive, expanding Company's market share through the promotion of Company's business and sales, and actively holding sales meetings, training seminars, and other events (and ensuring attendance of such events by Branch Employees); and
>
>    \*     \*     \*     \*

[ECF No. 15-5 at PageID #: 182-83](#).   Cromer admits competing with Union Home in the same or similar capacity at Homeside, in the same geographic area, and with the same team he managed at Union Home.[6]   At his deposition, he testified:

>    Q.    In your position at this point, in March of 2019, were you developing and still maintaining a network of relationships with existing and prospective customers of Union Home in the area?
>    A.    Yes, sir.
>    Q.    And were you still promoting the image and reputation of Union Home in the Youngstown area?
>    A.    During employment, yes.
>    Q.    And were you promoting Union Home's business and sales in the area where your Youngstown branch office was located?
>    A.    Yes, sir.

[ECF No. 25-1 at PageID #: 947-48](#).

>    Q.    Your duties included developing and maintaining a network of relationships with existing and prospective clients and promoting the image and reputation of the company.
>        Is that correct?
>    A.    Yes, sir.

---

[6] James Ferriter testified at his April 9, 2021 deposition that "we don't have any people in Youngstown right now.   So Erik took the whole branch with him, or they all went to Homeside."   [ECF No. 28 at PageID #: 1558](#).

(4:21CV0385)

> Q. You were developing and maintaining this network of relationships in the same geographic area you did the same thing for Union Home, correct?
> A. I've done that my entire professional career, that's correct.
> Q. And this -- now you're doing for Homeside in the same geographic area you did the same duties and customer service in -- or for Union Home?
> A. I maintain -- yes. That's -- in section (v), that's correct.
> Q. And that next line, starting with expanding; you're required to expand the company's market share through the promotion of the company's business and sales.
> That's in the same geographic markets that you worked in for Union Home, correct?
> A. That's correct.

ECF No. 25-1 at PageID #: 1101-1102.

> Q. Okay. So I was just reading from this. And all I was trying to confirm is that, as you, on behalf of Homeside, are developing and maintaining a network of relationships with existing and prospective clients, you're in competition with Union Home in the market to do that?
> A. Yeah, with every other lending institution in the marketplace, correct. Yes, that is accurate.

ECF No. 25-1 at PageID #: 1154.

On January 16, 2021, Latronica sent Cromer a preapproval letter, which Cromer sent to the customer's realtor. ECF No. 20-6 at PageID #: 845-48. No reason has been offered by Cromer for why Latronica could not have sent these documents directly to the customers. Therefore, it appears that these were Cromer's customers for which he was originating loans.

### IV. Law and Analysis

Defendants argue that the activity Plaintiff seeks to forbid Cromer from performing (originating loans) is merely incidental to Cromer's primary employment as a non-producing branch manager, a position in which he is to dedicate 100% of his time to managing others. Importantly, as a non-producing branch manager, Cromer does not originate loans. Defendants argue Cromer has not used or disclosed the customer list (ECF No. 20-1 at PageID #: 486-91) to

11

(4:21CV0385)

Homeside, and, importantly, has even offered to destroy it. ECF No. 15-1 at PageID #: 177, ¶ 13. Cromer declares he "sent the list to use as a template to create a new customer list, not to use the customer information contained in the list." ECF No. 15-1 at PageID #: 177, ¶ 13.

Defendants posit four reasons for denying this Motion. First, the non-compete covenant is unenforceable under Ohio law, as it is unreasonable as per the Ohio Supreme Court' *Raimonde* test of reasonableness. See *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21 (1975). Moreover, Plaintiff selectively enforces its non-compete agreements[7] and should be estopped from asserting its right to prevent competition, which has now been waived. Alternatively, Cromer is not in violation of the non-compete covenant. Cromer's position with Homeside is not in the same or similar capacity as his former position with Plaintiff. Third, Cromer has not breached the non-solicitation covenant, nor has he threatened to do so. The Union Home employees who left to work for Homeside, James Boots and Jerry Latronica,[8] did so of their own accord. Finally, Cromer has not used or disclosed Union Home's confidential information.

Under Ohio law, a non-compete clause will only be enforced if "the employer can show by *clear and convincing evidence* that the restrictions imposed . . . (1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public." *Brentlinger*

---

[7] A federal court analyzed the question of "whether a party sued for breach of a non-compete agreement may raise selective enforcement as an affirmative defense to the breach of contract claim under Ohio law." *GCA Servs. Grp. v. ParCou, LLC*, 2016 WL 7192175, at *3 (W.D. Tenn. Dec. 12, 2016). This was answered in the negative by the magistrate judge and was then affirmed by the district judge.

[8] Plaintiff argues that Cromer negotiated the terms of employment for Latronica and Boots with Homeside. *See* Reply Memorandum (ECF No. 19) at PageID #: 243.

(4:21CV0385)

Enterprises v. Curran, 141 Ohio App.3d 640, 645-46 (2001) (citing Raimonde, supra, at paragraph two of the syllabus) (emphasis added).[9]

"A preliminary injunction is an extraordinary measure that has been characterized as one of the most drastic tools in the arsenal of judicial remedies." Bonnell v. Lorenzo, 241 F.3d 800, 808 (6th Cir. 2001) (citations and internal quotation marks omitted). As recently stated by the United States Court of Appeals for the Sixth Circuit:

> "A district court must balance four factors in determining whether to grant a preliminary injunction: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.' " Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty., 796 F.3d 636, 642 (6th Cir. 2015) (quoting Bays v. City of Fairborn, 668 F.3d 814, 818-19 (6th Cir. 2012)). "These factors are not prerequisites, but are factors that are to be balanced against each other." Overstreet v. Lexington-Fayette Urban

---

[9] "The nine *Raimonde* [reasonableness] factors are: 1. Whether the restriction is temporally and spatially limited; 2. Whether the employee represents the sole contact with the customer; 3. Whether the employee is possessed with confidential information or trade secrets; 4. Whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; 5. Whether the covenant seeks to stifle the inherent skill and experience of the employee; 6. Whether the benefit to the employer is disproportional to the detriment to the employee; 7. Whether the covenant operates as a bar to the employee's sole means of support; 8. Whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and 9. Whether the forbidden employment is merely incidental to the main employment." Union Home Mortgage Corp. v. Payne, No. 1:20CV0026, 2020 WL 4282309, at *7 (N.D. Ohio March 9, 2020) (Gaughan, C.J.).

(4:21CV0385)

*Cnty. Gov t*, 305 F.3d 566, 573 (6th Cir. 2002). However, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.' " *D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 326-27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Livingston County*, 796 F.3d at 642 (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)); *see also Tenke Corp.*, 511 F.3d at 546 n. 2 ("[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits.").

*Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020). No single factor is determinative except that "a finding that there is simply no likelihood of success on the merits is usually fatal." *Miles v. Michigan Dept. of Corr.*, No. 19-2218, 2020 WL 6121438, at *4 (6th Cir. Aug. 20, 2020) (citing *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000)). Plaintiff has met the necessary requirements for injunctive relief in the case at bar.

### A. Clear and Convincing Burden of Proof

The movant "bears the burden of persuading the court that the factors weigh in favor of granting a preliminary injunction." *Williamson v. White*, No. 93-6017, 1994 WL 49594, at *1 (6th Cir. Feb. 17, 1994) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 441 (1974)). "The burden of proving that the circumstances clearly demand such an extraordinary remedy is a heavy one since the party seeking the injunction must establish its case by clear and convincing evidence."

(4:21CV0385)

*Hartman v. Acton*, --- F.Supp.3d ----, No. 2:20-CV-1952, 2020 WL 1932896, at *2 (S.D. Ohio April 21, 2020) (internal quotation marks omitted) (citing *Overstreet*, 305 F.3d at 573; *Honeywell, Inc. v. Brewer-Garrett Co.*, No. 97-3673, 1998 WL 152951 (6th Cir. March 23, 1998)). A preliminary injunction cannot be issued unless these very stringent requirements are met. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Plaintiff has shown by clear and convincing evidence its entitlement to injunctive relief.

### B. Likelihood of Success

Plaintiff has shown a substantial likelihood that Cromer has violated and is currently violating the enforceable covenants in the Employee Agreement (ECF No. 1-1) with Union Home, as well as the Defend Trade Secrets Act, the Ohio Uniform Trade Secrets Act, and the common law. Cromer's primary response to Union Home's claims that he is misappropriating trade secrets and violating his non-compete agreement is that Cromer is not working in the "same capacity" as he worked for Union Home. ECF No. 15 at PageID #: 164. Cromer attempts to hide behind his title as a non-producing branch manager for Homeside, even though the significant documentary evidence set forth by Plaintiff[10] shows he was working directly with mortgage loan customers on behalf of Homeside both before and after he left Union Home. Plaintiff has demonstrated a substantial likelihood of success on the merits of its claims.

### C. Irreparable Injury

"An irreparable injury is one for the redress of which . . . there could be no plain, adequate and complete remedy at law, and for which [money damages] would be impossible, difficult or incomplete." *Ohio Turnpike Comm'n v. Texaco, Inc.*, 35 Ohio Misc. 99, 105, 297

---

[10] The Court has set forth only some of that evidence in this document.

(4:21CV0385)

N.E.2d 557 (1973). As in the case at bar, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute" and, "[s]imilarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992); see also Brakefire, Inc. v. Overbeck, 144 Ohio Misc.2d 35, 64, 878 N.E.2d 84 (2007) (citing *Basicomputer*).

Plaintiff has shown a threat of irreparable injury absent entry of a Preliminary Injunction, including the destruction of Plaintiff's goodwill and exploitation of its trade secrets. The Employee Agreement (ECF No. 1-1) specifically provides that, in the event the restrictive covenants are violated, Cromer agrees that "such violation will cause irreparable harm to [Union Home]" and he "consents to the issuance of a restraining order and/or an injunction by a court of competent jurisdiction." ECF No. 1-1 at PageID #: 25, ¶ 6.

### D.  Harm to Others

Regarding harm to others, Cromer claims Homeside's business and the livelihood of the other employees at its Youngstown office would be harmed if Cromer's non-compete agreement was enforced. ECF No. 15 at PageID #: 172. First, Homeside is a defendant to this action based on its alleged interference with Union Home's employee agreement with Cromer. Second, Homeside actively facilitated the closing of loans with Cromer, while Cromer was still employed by Union Home, such that Homeside is not in a position to now claim harm. As to the other Homeside employees, they would only be harmed if Cromer were actively involved in loan origination for which they were benefitting, which is borne out by the evidence before the

(4:21CV0385)

Court. Therefore, this is the very conduct that should be enjoined as violating the Employee Agreement (ECF No. 1-1) and not a public interest harm to be considered by the Court.

### E. Public Interest

A Preliminary Injunction is in the public interest and is necessary to protect Plaintiff's legitimate interests, as well as the interests of its customers. The public interest would include the citizens of Ohio and Youngstown, which will continue to have ample access to competitive mortgages even if Cromer is required to honor his agreement. Declaration of Jim Ferriter (ECF No. 19-1) at PageID #: 270, ¶ 9. The injunction will not harm any third party. And, "preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Century Bus. Servs., Inc. v. Urban*, 179 Ohio App.3d 111, 118, 900 N.E.2d 1048 (2008). As the Court stated at the conclusion of the electronic hearing, contractual obligations matter.

### VI.

For the reasons set forth herein and those that have been articulated in the memoranda of the points and authorities on which Plaintiff relies in support of the motion (ECF Nos. 3, 4, and 19), Plaintiff's Motion for Preliminary Injunction (ECF No. 3) is granted. To prevent further harm to Plaintiff Union Home Mortgage Corp.'s business, Defendant Erik Cromer and anyone in active concert or participation with Cromer, including Defendant Homeside Financial, LLC, is enjoined from: (1) competing with Union Home within 100 miles of the office in which Cromer worked; (2) soliciting Union Home's employees; and, (3) using or disclosing Union Home's confidential information for their or Homeside's competitive benefit.

(4:21CV0385)

Plaintiff is ordered to post a bond[11] in the amount of $10,000 with the Clerk of Court. The Preliminary Injunction will take effect upon the posting of bond, which will be reflected on the public docket.

       IT IS SO ORDERED.


  April 23, 2021                                                          */s/ Benita Y. Pearson*  
Date                                                                   Benita Y. Pearson  
                                                                               United States District Judge

---

[11]   A bond acceptable to the Clerk's Office is acceptable to the Court.